UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

        Plaintiff,

        Case No. 21-CV-10199
v.        Hon.

VIKTOR GJONAJ,

        Defendant.

_____/

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC"), alleges as follows:

### SUMMARY OF THE ACTION

1. The SEC brings this civil law enforcement action to address Defendant Viktor Gjonaj's ("Gjonaj") fraudulent offer and sale of securities to at least 24 investors, who invested approximately $26.4 million from at least mid-2016 to 2019. Most of the investors, like Gjonaj, are members of the Albanian-American community in the Detroit area. Gjonaj generally told investors that he would use their funds to purchase, develop, and resell real estate properties for a profit. In fact, Gjonaj did not use any of their money for real estate investments.

2. Instead, Gjonaj used the investors' money to support his obsession with winning the Michigan Lottery, spending at least $10 million of their money on the Daily 3 and Daily 4 Lottery. Gjonaj often spent hundreds of thousands of dollars a week on Lottery tickets, at times buying as much as $1 million of Lottery tickets per week.

1

3. Gjonaj sent only approximately $7.4 million back to investors in purported returns on real estate deals. However, all of these "returns" were actually funded by Gjonaj's Lottery winnings. None of the money the investors received was generated by real estate investments. By August 2019, Gjonaj owed the investors approximately $19 million and had lost all of his own and his investors' money.

4. By engaging in this conduct, Gjonaj violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b), and (c) thereunder [17 C.F.R. 240.10b-5(a), (b), and (c)].

5. In connection with this lawsuit, the SEC seeks a permanent injunction against Gjonaj to enjoin him from future violations of the above-cited provisions of the federal securities laws. The SEC further seeks an order requiring Gjonaj to pay disgorgement, plus prejudgment interest, of the ill-gotten gains that he received through his fraud, along with the imposition of civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**JURISDICTION AND VENUE**

6. The Court has jurisdiction over this action pursuant to Sections 21(d) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa] and Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v]. Gjonaj, directly or indirectly, has made use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

7. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, and courses of business constituting the violations alleged in this Complaint occurred within the jurisdiction of the United States District Court for the Eastern District of Michigan. In addition, during the relevant time period, Gjonaj resided and conducted business within the Eastern District of Michigan.

## THE DEFENDANT

8.  **Viktor Gjonaj** is 43 years old and last resided in Shelby Township, Michigan. He is the sole owner of Title Plus Title Services LLC. During the relevant time period, Gjonaj operated out of an office in Troy, Michigan.

## FACTS

9.  From at least mid-2016 to 2019, Gjonaj raised approximately $26.4 million through the offer and sale of securities in the form of investment contracts to at least 24 investors in at least 66 purported real estate deals. Most of the investors, like Gjonaj, are members of the Albanian-American community in the Detroit area. Gjonaj was known within the community to be a successful real estate entrepreneur.

10. Gjonaj's fraud began with his obsession with winning the Michigan Lottery. In June 2016, Gjonaj thought he had developed a strategy that would all but guarantee he would win in both the Daily 3 and Daily 4 Lottery draws. Gjonaj began betting between $25,000 and $100,000 per week using his strategy.

11. By July 2016, Gjonaj needed additional cash to continue his Lottery playing, and began raising money through the fraudulent offer and sale of purported investments in real estate. Gjonaj solicited investors in his community by, among other things, speaking to them in person and on the telephone.

12. Gjonaj generally told investors that he would use their funds to purchase, develop, and resell real estate properties for a profit, and pay investors their pro-rata share of those profits. Gjonaj did not promise investors a specific investment return, but when he paid certain investors purported profits from their investments, he included a 50% "return" in addition to their principal.

13. Gjonaj sold some of the investors "membership interests" in a particular limited liability company that Gjonaj created to purchase, develop, and resell real estate property. Some of these investments were made pursuant to written operating agreements entered into by the investor and Gjonaj under which they each acquired membership interests in a company in exchange for capital contributions. The capital contributions were to be pooled. These agreements contemplated the possibility of additional investors, describing Gjonaj and the investor as "initial Members," describing their capital contributions as "initial capital contributions," and stating, among other things, that they would be "binding on any individuals and/or entities who may acquire membership interests . . . in the future." The agreements designated Gjonaj as the "Operating Manager" responsible for carrying out the business of the LLCs and provided that the investor/members would receive their pro-rata portion of proceeds from the sale of the property, and that each member would only profit if the project was profitable. The agreements further stated that the membership interests could not be sold without registration under the Securities Act or any other applicable securities laws or an exemption therefrom.

14. Gjonaj also sold investments pursuant to verbal agreements. These investments were made pursuant to oral "handshake" deals between the investors and Gjonaj without written documentation. As he did in connection with the investments that included a written

agreement, Gjonaj told these investors that he would be a co-investor in the investments, would pool his money with the investors, and would use the investment funds to purchase, develop, and resell real estate properties for a profit.

15. Gjonaj created Title Plus Title Service LLC, a sham real estate title company with no legitimate business, and represented to investors that it would serve as the closing agency for the real estate deals. He instructed investors to make out their checks or wire their funds to himself or Title Plus. Gjonaj deposited and pooled investor funds in an account in the name of Title Plus. Gjonaj then directed the money from the Title Plus account to his personal accounts, other Gjonaj entity accounts, or directly to the Lottery. Gjonaj never purchased any of the real estate properties as he had represented to investors.

16. Of the approximately $26.4 million Gjonaj raised from investors, Gjonaj spent at least $10 million on lottery tickets and directed millions to his personal checking account. At times, Gjonaj bought as much as $1 million of Lottery tickets per week.

17. Between 2016 and 2019, Gjonaj won several lottery prizes totaling at least $25 million and used approximately $7.4 million to pay investors purported principal and interest payments on their investments. Gjonaj made these payments via wire transfer and check. He claimed the payments were generated by the sale proceeds from the (non-existent) real estate transactions. His lottery winnings, however, were insufficient to pay what he owed to the investors because Gjonaj lost far more money than he won.

18. By August 2019, Gjonaj owed the investors approximately $19 million, had lost all of his own and his investors' money, and had not purchased any real estate.

## COUNT I
### Violation of Section 17(a) of the Securities Act

19. The SEC re-alleges and incorporates by reference paragraphs 1 through 18 as though fully set forth herein.

20. Gjonaj, directly or indirectly, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly employed one or more devices, schemes, or artifices to defraud, (2) knowingly or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

21. By reason of the foregoing, Gjonaj, directly or indirectly, violated and, unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT II
### Violation of 10(b) of the Exchange Act and Exchange Act Rule 10b-5

22. The SEC re-alleges and incorporates by reference paragraphs 1 through 18 as though fully set forth herein.

23. Gjonaj in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, or any national securities exchange, directly and indirectly used and employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices, and courses of business which

operated or would have operated as a fraud or deceit upon investors.

24. Gjonaj acted with scienter in that he knowingly engaged in the fraudulent conduct described above.

25. By reason of the foregoing, Gjonaj violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

### I.

Enter an Order finding that Gjonaj committed, and unless restrained, will continue to commit, the violations alleged in this Complaint;

### II.

Permanently restrain and enjoin Gjonaj from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### III.

Order Gjonaj to disgorge the ill-gotten gains that he received as a result of the violations alleged in this Complaint, plus prejudgment interest;

### IV.

Order Gjonaj to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the

Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable applications or motions for additional relief within the Court's jurisdiction; and

## VI.

Such other and further relief as the Court deems necessary and appropriate.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: January 28, 2021

Respectfully Submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

　/s/ Daniel J. Hayes
Daniel J. Hayes, Illinois Bar No. 6243089
Steven L. Klawans, Illinois Bar No. 6229593
Marlene Key-Patterson, Illinois Bar No. 6296919
James G. O'Keefe, Illinois Bar No. 6293490
U.S. Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (facsimile)
hayesdj@sec.gov
klawanss@sec.gov
keym@sec.gov
okeefej@sec.gov

*Attorneys for Plaintiff*

**LOCAL COUNSEL**
Matthew Schneider, United States Attorney
Karen Reynolds, Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9100
karen.reynolds@usdoj.gov